IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


MARIANA HENTEA,                 )
                                )
Plaintiff,                      )
                                )
vs.                             )      NO. 2:04-CV-526
                                )
THE TRUSTEES OF PURDUE          )
UNIVERSITY, et al.,             )
                                )
Defendants.                     )


## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, filed by Defendants, the Trustees of Purdue University, Dennis Korchek, Reza Kamali, and Howard Cohen, on February 15, 2006. For the reasons set forth below, this motion is **GRANTED**.  The Clerk is **ORDERED** to **DISMISS** this case with prejudice.


BACKGROUND

In December 2004, Plaintiff, Mariana Hentea, initially filed her complaint against Purdue University Calumet, alleging various forms of employment discrimination. Subsequently, Plaintiff amended her complaint to add the Trustees of Purdue University as a named Defendant in the place of Purdue University Calumet.  In addition, she added a First Amendment claim alleging she was terminated in retaliation for engaging in constitutionally protected speech.

In September 2005, Plaintiff filed her Third Amended Complaint, adding Defendants, Dennis Korchek, Reza Kamali and Howard Cohen, each in their individual and official capacities.  According to the Third Amended Complaint, Plaintiff claimed Defendants terminated her on the basis of: (1) her national origin and gender, both in violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"); (2) her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. section 621 ("ADEA"); and (3) retaliating against her right for engaging in protected speech in violation of her rights under the First Amendment of the United States Constitution and Article 1, section 9 of the Indiana Constitution.

Defendants have filed the instant motion requesting summary judgment as to all claims.  In response, Plaintiff has conceded that Defendants are entitled to the entry of summary judgment on her gender and age discrimination claims.  Thus, the remaining issues to be determined here are whether there is a genuine issue of material facat as to whether Plaintiff was discriminated on the basis of national origin and whether Plaintiff's federal and state constitutional rights to free speech were violated.

DISCUSSION

Facts

Plaintiff is a female, of Romanian descent, who was employed as a tenure track assistant professor in the School of Technology at

Purdue University Calumet ("Purdue Calumet") from August 2002 through May 16, 2004. The Trustees of Purdue University is an entity created by the Indiana legislature and operates Purdue Calumet in Hammond, Indiana. *See* IND. CODE §§ 20-12-36-4 and 20-12-16-1 *et seq*. Howard Cohen at all relevant times has served as the chancellor of Purdue Calumet's campus. (Cohen Dep. p. 4; Ex. A). Dennis Korchek at all relevant times has been employed as the Dean of the School of Technology at Purdue Calumet. (Korchek Dep. p. 8; Ex. B). Reza Kamali was hired as the Head of the Computer Information Systems Information Technology[1] ("CISIT") Department at Purdue Calumet in August 2003 and continues to work in that capacity to date. (Kamali Dep. pp. 8-9; Ex. C).

Plaintiff was hired by Purdue Calumet as a tenure-track faculty member in the CISIT Department, a department in the School of Technology, at Purdue Calumet. (Pl. Dep. p. 16; Ex. A). As such, she worked subject to a 1-year renewable academic appointment. (Pl. Dep. pp. 16-18; Ex. A & B). Plaintiff was evaluated for reappointment each academic year. (Pl. Dep. pp. 56-57). Plaintiff was required to demonstrate satisfactory progress in three broad areas – teaching, scholarship and service – in order to receive a favorable recommendation for reappointment. (Pl. Dep. pp. 58-60; Ex. V)

A tenure-track faculty member in the School of Technology is

---

[1]This department has also been called Information Systems and Computer Programming, or ISCP. (Pl. Dep. p. 16).

-3-

evaluated yearly by a committee comprised of faculty peers within her department ("Department Tenure Committee") and by a committee comprised of faculty members within the School ("School Tenure Committee"). (Pl. Dep. pp. 58-60; Ex. V). The tenure-track faculty member submits a written "tenure document" to the committees and each committee provides a "progress evaluation" and also gives feedback to the candidate, including ways for the candidate to improve his tenure document and ways to improve performance in each of the three evaluative areas. (Pl. Dep. p. 137; Ex. V).

With consideration given to the committees' evaluation and recommendation, the department head and dean each make a recommendation whether to reappoint the tenure-track faculty member for the subsequent academic year based upon their own personal knowledge of the faculty member's performance. (Pl. Dep. pp. 58-60; Ex. V; Kamali Dep. pp. 28-29; Korchek Dep. pp. 43-45). Typically, the department head and dean issue a written recommendation reflecting the rationale for their reappointment recommendation. (Pl. Dep. Ex. V). The vice chancellor of academic affairs receives the reappointment recommendations from the department head and dean together with the written committee recommendations. (Pl. Dep. Ex. V). If the tenure-track faculty member has demonstrated satisfactory progress in each of the three examined areas, the vice chancellor approves the recommendations of the department head and dean. (Pl. Dep. Ex. V). If she has not demonstrated satisfactory progress, then the vice

-4-

chancellor has the option to recommend no reappointment.  (Pl. Dep. Ex. V).  The chancellor then reviews the candidate's file and has final approval of a tenure-track faculty member's reappointment or non-reappointment.  (Pl. Dep. Ex. V; Cohen Dep. p. 9).

Early in Plaintiff's employment, she complained to the network administrator, Jason Dravit, that the computer laboratory was in disarray.  (Pl. Dep. p. 40).  Plaintiff believed Jason Dravit turned students against her as a result of these complaints.  (Pl. Dep. p. 40).

Around December 2002, Plaintiff was asked by someone on the faculty to serve as a neutral advisor in the termination grievance of Medhi Raoufi, a faculty member of Iranian descent who was not reappointed in the CISIT Department and engaged in a grievance and complaint of discrimination against Purdue Calumet.  (Pl. Dep. p. 25, 32-35).  Plaintiff agreed to serve in that capacity and went with Raoufi to his grievance committee hearing on December 9, 2002.  (Pl. Dep. p. 34).  However, she did not issue any written or oral statement supporting Raoufi.  (Pl. Dep. p. 32).

In February 2003, Plaintiff required students in her distance learning course to take tests on campus.  (Pl. Dep. pp. 46-47).  Plaintiff checked with unidentified faculty, who could not point to any specific policy on testing procedures in distance learning courses.  (Pl. Dep. p. 47).  When students complained about the policy, Foreman asked Plaintiff to allow the students to take the

exams offsite.  (Foreman Dep. pp. 20-21).

On March 13, 2003, Plaintiff wrote Chancellor Cohen and requested a formal harassment investigation of Foreman, Dr. Sue Conners, and Jason Dravit.  (Pl. Dep. Ex. D).  She claimed Foreman infringed on her academic freedom by instigating a few distance learning students not to come to campus by telling them that Plaintiff was obligated to give tests in distance learning cases online.  (Pl. Dep. Ex. D).  Plaintiff also complained that Foreman would not allow her teaching assistant to work in the CISIT lab alone.  (Pl. Dep. Ex. D).  Plaintiff claimed Conners told her that she must vote for approval of certain curricula changes during a departmental meeting.  (Pl. Dep. Ex. D).  Plaintiff also complained that Dravit would fail to resolve problems in the CISIT laboratory or "turn off the network" while she was conducting lectures, which was a disruption and embarrassment.  (Pl. Dep. Ex. D). In response, Foreman penned a letter to Chancellor Cohen rebutting Plaintiff's complaints and informing him that the CISIT Department did, in fact, have a policy on distance learning.  (Pl. Dep. Ex. E, RF-01 RF-02).   Purdue Calumet appointed Victor Holden as an investigator to look into Plaintiff's charges.  (Holden Decl. ¶ 3). Holden interviewed each of the parties and examined the submitted written materials; ultimately, he determined that no harassment occurred.  (Holden Decl. ¶¶ 3 & 4).  Based on all of the evidence, Chancellor Cohen concluded that Plaintiff was reluctant "to accept the distance learning policies of the department.  (Cohen Dep. Ex. 38).

Plaintiff's performance was first formally evaluated in March 2003, about seven months into her position. (Pl. Dep. pp. 35-36; Ex. C). On March 26, 2003, the Department Tenure Committee voted 4 to 1 to terminate Plaintiff. (Foreman Dep. pp 13-14; Ex. 23, p. PU-0012). The Department Tenure Committee noted that: "there have been numerous complaints from students regarding her effectiveness in teaching[;]" Plaintiff "exhibited a negative attitude in her service to the department" and "verbally abuses staff of all levels in committee meetings[;]" Plaintiff "refuses the advice of senior tenured faculty relating to academic policy issues of the department and exhibits an overall attitude of not caring to be part of the [CISIT] team[;]" and that Plaintiff's research "would fit more appropriately in an engineering, rather than a software discipline." (Foreman Dep. Ex. 23, p. PU-0012).

Nevertheless, Foreman, in his capacity as acting CISIT department head, "with great reservations" recommended that Plaintiff be allowed to continue towards tenure. (Foreman Dep. Ex. 23, p. PU-0011). Foreman noted Plaintiff's teaching deficiency, problems working within the governance of the Department and student complaints about her conduct and organization within the classroom. (Foreman Dep. Ex. 23, p. PU-0011).

Both the Department Tenure Committee's recommendation to terminate and Foreman's recommendation to allow Plaintiff to continue towards tenure were forwarded to the School Tenure Committee and to

-7-

Dean Korchek.  (Korchek Dep. pp. 22-23).  The School Tenure Committee and Dean Korchek recommended Plaintiff continue toward tenure. (Korchek Dep. pp. 22-23).  Plaintiff was provided with a copy of Foreman's and the Department Tenure Committee's written recommendations. (Pl. Dep. pp. 35-36).  Plaintiff was reappointed as assistant professor in the CISIT department for the academic year of August 2003 through May 2004.  (Pl. Dep. pp. 44-45; Ex. B).

In September 2003, Jeff Schieb, a continuing lecturer at Purdue Calumet, sent out an e-mail message to a number of his colleagues regarding a possible increase in the teaching load of full-time continuing lecturers.  (Pl. Dep. pp. 102-103; Ex. P).  In that message, Schieb set out his current teaching load. (Pl. Dep. pp. 102-103; Ex. P).  When Korchek received this e-mail, he forwarded it to a group of faculty members, including Plaintiff.  (Pl. Dep. p. 103; Ex. P).  After receiving that e-mail, Plaintiff sent out a memorandum to Kamali and Korchek where she raised her own concern regarding her teaching load as compared with Shieb's – she taught four courses and three labs, yet was not paid for an overload, while Schieb was being paid for teaching an overload.  (Pl. Dep. Ex. O & Q).  In the following month, Plaintiff met with Dean Korchek and the CISIT Department Head Kamali to discuss this issue.  (Pl. Dep. Ex. O & Q). Plaintiff contends that during the meeting Korchek threatened that she would not get tenure if she discussed these matters outside the Department.  (Pl. Dep. pp. 112-115).  However, Korchek attempted to

-8-

convince Plaintiff that she misinterpreted what he said.  (Pl. Dep.
Ex. O).  The issues raised by Plaintiff were ultimately addressed by
an internal audit reported on April 20, 2004.  (Korchek Dep. p. 26-32;
Pl. Ex. 29; Pl. Dep. pp. 112-113).

Plaintiff was next evaluated in November 2003.  (Pl. Dep. pp. 61-
62; Ex. F).  At that time, the CISIT Department Tenure Committee voted
unanimously to not reappoint Plaintiff for the 2004-2005 academic
year.  (Pl. Dep. Ex. F).  In general, the Committee found Plaintiff to
have a negative impact on the CISIT department and did not believe
Plaintiff could contribute to the goals of the CISIT department.  (Pl.
Dep. Ex. F).  Kamali was the CISIT department for Plaintiff's second
evaluation.  (Kamali Dep. p. 27-28; Pl. Dep. Ex. G).  Kamali concurred
with the Department Tenure Committee's decision and recommended
termination as well.  (Pl. Dep. Ex. G).

The recommendations of both the CISIT Department Tenure Committee
and Kamali were forwarded to the School Tenure Committee.  (Korchek
Dep. pp. 51-54).  Plaintiff also submitted a memorandum responding to
the deficiencies noted by the Department Tenure Committee and Kamali.
(Pl. Dep. p. 65; Ex. H).  In addition, Plaintiff met with the School
Tenure Committee.  (Pl. Dep. pp. 67-68).  Based upon its review of all
the materials, the School Tenure Committee voted 4 to 1 in favor of
not reappointing Plaintiff.  (Pl. Dep. p. 69; Ex. J).

Dean Korchek reviewed and considered all of the submitted
materials.  (Korchek Dep. pp. 51-54; Pl. Dep. Ex. I).  Ultimately,

-9-

although Plaintiff showed promise in scholarly endeavors, Korchek found Plaintiff's teaching to be weak and not a good fit in the CISIT department. (Pl. Dep. Ex. I)  Korchek also recommended termination of Plaintiff's appointment. (Pl. Dep. p. 70; Ex. I).  Thus, on December 16, 2003, Korchek notified Plaintiff that she would not be reappointed for the full 2004-2005 academic year. (Pl. Dep. Ex. K).

On January 16, 2004, Plaintiff submitted a grievance regarding her termination.  (Pl. Dep. Ex. M).  In the grievance, Plaintiff referenced sixteen "substantive and procedural" points, which she alleged dictated the reversal of the decision not to reappoint her for the 2004-2005 academic year.  (Pl. Dep. Ex. M).  Notably, Plaintiff charged that her termination was in retaliation "for me being involved in a grievance filed by a faculty colleague in the CISIT Department and for me raising issues with the distance learning policy."  (Pl. Dep. Ex. M).  Plaintiff's grievance was heard by a grievance panel on May 5, 2004.  In a 5-0 vote, the grievance panel found that the retaliation claims were not supported by the evidence.  (Pl. Dep. Ex. T).  On June 2, 2004, Chancellor Cohen accepted the recommendations of each of the previous levels of review and approved Korchek's December 16, 2003, Notice of Non-Renewal.  (Pl. Dep. Ex. U).


Summary Judgment Standard

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law

will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  In this situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.


Liability

The threshold issue concerns the Defendants' potential liability. Defendants maintain that the entity known as the Trustees of Purdue University is not a "person" for purposes of Plaintiff's federal constitutional claims.  Plaintiff does not dispute this issue.  And, rightly so. *Williamson v. Indiana Univ.*, 345 F.3d 459, 463 (7th Cir. 2003); *see also Wellman v. Trustees of Purdue Univ.*, 581 F. Supp. 1228

n.1 (N.D. Ind. 1984)(noting synonymous nature of Purdue University and its Board of Trustees). Therefore, the Trustees of Purdue University is entitled to summary judgment on Plaintiff's federal constitutional claims.

Similarly, it is uncontested that Defendants, Cohen, Korchek and Kamali are entitled to summary judgment on Plaintiff's federal constitutional claims against them in their official capacities. Indeed, claims against state officials in their official capacities are essentially claims against the state and, therefore, the individual Defendants enjoy the same protection in their official capacities as does the Trustees of Purdue University. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Consequently, Defendants Cohen, Korchek and Kamali are entitled to summary judgment on Plaintiff's federal constitutional claims for damages against them in their official capacities.

Finally, Cohen, Korchek and Kamali, in their individual capacities, are entitled to summary judgment on Plaintiff's Title VII claims. *Williams v. Banning*, 72 F.3d 552, 554 (7th Cir. 1995); *Patel v. Bd. of Governors of State Colleges & Universities*, No. 92 C 8300, 1997 WL 399644 at *2 (July 11, 1997, N.D. Ill).

With these underlying principles in mind, the merits of Plaintiff's remaining claims will be addressed.

Retaliation Claim[2]

Plaintiff claims her discharge was in retaliation for exercising her right to engage in protected speech; specifically, her speech regarding: (1) distance learning procedures; (2) teaching overloads; and (3) combined classes. (Plaintiff's Response Mem. p. 5). Not all speech by public employees is protected by the First Amendment such that constitutional concerns are raised if a public employer retaliates in response to that speech. *Smith v. Fruin*, 28 F.3d 646, 650 (7th Cir. 1994). When a public employee, such as Plaintiff, is terminated and alleges that her exercise of protected speech motivated the termination, the familiar *Connick-Pickering* test must be analyzed. *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

The first element of the *Connick-Pickering* test requires the Court to determine whether the speech in question addresses a matter of public concern. *See Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S.

_____

[2]Notably, the analysis of Plaintiff's federal retaliation claim is identical to that contained in her state retaliation claim. *Klunk v. County of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999); *City of Indianapolis v. Heath*, 686 N.E.2d 940, 942-43 (Ind. Ct. App. 1997). Not surprisingly, the parties do not differentiate their analysis of the law in this respect.

-14-

at 147.  If the speech involved addresses a matter of public concern, the Court must then address the second element – the *Pickering* balancing test - to determine whether "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999)(citation omitted).  Both of these issues are questions of law. *Wainscott v. Henry* 315 F.3d 844, 848 (7th Cir. 2003); *Snider v. Belvidere Township*, 216 F.3d 616, 620 (7th Cir. 2000).

The threshold issue is whether Plaintiff's speech addressed matters of public concern.  Plaintiff argues that her speech on distance testing procedures, teaching overloads, and combined classes addresses matters that are generally of public concern.  In analyzing whether Plaintiff's speech is, in fact, constitutionally protected, the Court "must look at each act of speech separately to see whether it touched upon a matter of public concern." *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir. 1989).  It is Plaintiff's burden to demonstrate that her speech was on a matter of public concern. *McGreal v. Ostrov*, 368 F.3d 657, 672 (7th Cir. 2004).  Plaintiff has failed to meet this burden.

Plaintiff raised the issue with Purdue that tests in distance learning courses should be administered and taken in class, rather than from home.  She asserts this is a matter of public concern

"because a state university should not be handing out grades based on
questionable evaluative procedures of unmonitored, online tests."
(Plaintiff's Response, p. 8).

In September 2003, Plaintiff inquired about the fact that she
taught four different courses and three different labs, which was an
overload as compared to others in the CISIT department.  (Pl. Dep.
Exs. O & Q).  Plaintiff then met with Dean Korchek and Kamali to
discuss her teaching load in comparison to Jeffrey Scheib, a
continuing lecturer who taught multiple sections of the same course
and was paid an overload.  (Pl. Dep. Exs. O & Q).  Plaintiff claims
that the issues of teaching load and combined classes are matters of
public concern because they "affect the quality of education because
too many students might be jammed into one class . . . ."
(Plaintiff's Response, p. 8).

Content is the most important consideration in determining
whether a public employee's speech is on a matter of public concern.
*Glass v. Dachel*, 2 F.3d 733 (7th Cir. 1993).  This Court agrees that
class size and the integrity of testing procedures are inherently
matters of public concern.  Nevertheless, the Seventh Circuit has
noted that "the fact that an employee speaks up on a topic that may be
deemed one of public import does not render [her] remarks on that
subject protected." *Smith*, 28 F.3d at 646; *see also Hartman v. Bd. of
Trustees of Cmty. College Dist. No. 508*, 4 F.3d 465, 471 (7th Cir.
1993)(opining that whether speech is a matter of public concern does

-16-

not turn on the general subject matter of the employee's speech).  The Court must "delve deeper into the precise content, form, and context of speech. . . ."  *Cliff v. Bd. of School Comm'rs of the City of Indianapolis, Indiana*, 42 F.3d 403, 410 (7th Cir. 1994).  Indeed, if speech "concerns a subject of public interest but the expression addresses only the personal effect upon the employee" then it does not touch upon a matter of public concern.  *Id.* (citing *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)).

Plaintiff has failed to demonstrate that any of her speech at issue was on a matter of public concern.  *McGreal*, 368 F.3d at 672.  Indeed, Plaintiff spends most of her time and effort focusing on the general importance of her speech.  She spends little, if any, time examining the specific content, form and context of each individual piece of speech for which she claims resulted in unlawful retaliation.  Basically, Plaintiff has failed to "delve deeper" into the constitutionally protected nature of her speech.  Upon review of the content, context and form, the record before the Court belies Plaintiff's assertion that she spoke on a matter of public concern.  To the contrary, it establishes that Plaintiff's expression of speech addressed only the personal effect these topics had upon her and her employment status at Purdue Calumet.

The specific content of Plaintiff's speech in all three occasions revolved around the Plaintiff, her classroom, her tenure status, and how the administration of the CISIT department affected her; it did

-17-

not revolve around the public.  As to form, in all three instances Plaintiff spoke only internally on the issues of distance learning testing procedures, teaching overloads and combined classes.  As such, the communications do not tend to "lend a public air to the form of these complaints." *Cf. Breuer*, 909 F.2d at 1038 (complaining to state authorities who had the prosecutorial authority to investigate them lended a public air to the form of the complaints); *see also Wales v. Bd. of Educ. of Comm. Unit School Dist. 300*, 120 F.3d 82, 84 (7th Cir. 1997)(noting that to whom the statement was made is a clue to determine whether the speech is of public or private concern). Contextually, the speech regarding the distance learning testing procedures was made in response to student complaints regarding her distance learning testing procedures; the speech regarding teaching overloads and combined classes was raised in response to another faculty member's complaint and focused on her being overworked and underpaid.

All of Plaintiff's complaints were therefore on her own behalf and in her own interest.  *Smith*, 28 F.3d at 651.  She was not speaking for the other faculty at Purdue Calumet and was not attempting to call pubic attention to these matters.  The record instead demonstrates that these issues were discussed internally to resolve internal, employment-related grievances.  *See e.g., Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581. 585-86 (7th Cir. 1992)(noting that speech of a disgruntled tenure-track employee whose statements are primarily

-18-

of personal interest regarding internal matters is not protected by the First Amendment).  As Plaintiff's speech was not on a matter of public concern, it was not protected under the *Connick-Pickering* analysis.  As a result, Defendants are entitled to summary judgment as to Plaintiff's retaliation claim predicated on the First Amendment of the United States Constitution as well as that based upon Article 1, section 9 of the Indiana Constitution.

National Origin Discrimination

Plaintiff's remaining claim revolves around her allegation that she was terminated on the basis of national origin discrimination, in violation of 42 U.S.C. section 1981 and Title VII, 42 U.S.C. section 2000e-5.  Because Title VII and 1981 claims are analyzed in the same manner, these claims will be addressed simultaneously.  *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002). National origin discrimination claims can be established under either a direct or indirect method of proof.  *O'Neal v. City of New Albany*, 293 F.3d 998, 1003-05 (7th Cr. 2002).  Plaintiff asserts both methods to prove unlawful discrimination.

"Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).  Plaintiff claims "there is direct evidence in this case that the CISIT department did not renew tenure for foreign nationals."

-19-

(Pl. Response, p. 16).  A fatal flaw to this claim, however, is that Plaintiff's factual assertion is unsubstantiated.  Moreover, such a speculatory comment does not rise to direct evidence of discrimination.  Upon review of the record, there has been no direct evidence that any of the Defendants discriminated against Plaintiff based on national origin.  As a result, Plaintiff must proceed through the indirect method.

Under the indirect method, Plaintiff is required to show that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered a materially adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably.  *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).

Plaintiff claims that fourth prong of the *McDonnell-Douglas* test- showing that similarly situated employees outside the protected class were treated more favorably – does not apply here because this is a mini-reduction in force ("mini-RIF") case.  In *Michas v. Health Cost Controls of Illinois, Inc.*, this Circuit modified the fourth prong of the *McDonnell-Douglas* framework in mini-RIF cases.  In mini-RIF cases, as opposed to general reduction-in-force cases, a single employee is discharged and her position is not filled; however, the employee's responsibilities are assumed by other members of the workforce.  209 F.3d 687, 693 (7th Cir. 2000).  The Seventh Circuit noted that "[b]ecause of the fear that employers might misuse the RIF description

to re-characterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show "similarly situated" employees who were treated more favorably."

Plaintiff claims this is a mini-RIF case because she was fired and her teaching duties were absorbed by other faculty members. However, Defendants do not characterize their termination of Plaintiff as a reduction in force. Quite the opposite, they claim Plaintiff was fired for cause; not performing her job satisfactorily. As Defendants have not proffered a reduction in force as their reason for termination, Plaintiff cannot escape the "similarly situated" requirement. This Circuit has explained that the only reason to do away with the "similarly situated" requirement is when an employer attempts to misuse a reduction in force description to characterize the termination of an employee. That is not the case here.

To fulfill her prima facie burden, Plaintiff is required to show that Purdue treated similarly situated employees outside of the protected class more favorably, which she failed to do. This failure is fatal to her national origin claim.

CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED**.   The Clerk is **ORDERED** to **DISMISS** this case with prejudice.

**DATED:  May 1, 2006**                        **/s/RUDY LOZANO, Judge**
                                                     **United States District Court**